**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**No. 53, Docket 26224.**

United States Court of Appeals
Second Circuit.

Argued Oct. 10, 1960.

Decided Nov. 10, 1960.

894

Melvin J. Welles, of the National Labor Relations Board, Washington, D. C.

(Stuart Rothman, Gen. Counsel; Dominick L. Manoli, Associate Gen. Counsel; Marcel Mallet-Prevost, Asst. Gen. Counsel; Elizabeth W. Weston, Atty., N. L. R. B., Washington, D. C., on the brief), for petitioner.

Harry Pozefsky, Gloversville, for respondents.

Before CLARK and FRIENDLY, Circuit Judges, and DIMOCK, District Judge.

FRIENDLY, Circuit Judge.

The National Labor Relations Board seeks enforcement of an order, 126 N. L. R. B. No. 2, relating to the same labor dispute between K-C Refrigeration Transport Company, Inc., hereafter "K-C," of Cohoes, N. Y., and Local 294 of the Teamsters, another phase of which has been dealt with in a case just decided. Our opinion there gives the facts as to K-C's business, its owners (the Kowalchyk family) and its employees. The complaint here sustained was that respondents had violated § 8(b) (1) (B) of the National Labor Relations Act, 29 U.S. C.A. § 158(b) (1) (B), which makes it an unfair labor practice for a labor organization "(1) to restrain or coerce * * * (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances."

The Board was justified in finding the facts to have been as follows:

For several years K-C and Local 294 had been parties to standard agreements negotiated in behalf of numerous trucking concerns in the Albany area by an employer organization, Highway Transport Association of Upstate New York. The last of these contracts was to expire July 31, 1958; some time before then the Association and Local 294 notified K-C that area-wide negotiations for a new contract were to begin. On July 9 K-C wrote the union expressing willingness to go along with the proposed new contract except that K-C required special conces-

sions on two points, to which it asked the union to agree. The union not answering, K-C retained Jones, an Albany attorney specializing in labor matters. In late July and early August, Jones endeavored repeatedly to communicate with Robilotto, the union president, without success; Jones finally got through to Robilotto by first giving an assumed name. Robilotto said that he was busy with the area-wide negotiations but that the union would do what it could to "accommodate the [K-C] boys' problems," and agreed to call Jones in mid-September. Hearing that the area-wide negotiations were substantially completed, Jones, on September 16, telephoned Robilotto. The latter, returning the call the next day, said that "K-C would have to take the same contract everybody else got" but nevertheless agreed to call Jones when ready to talk. In late September, Jones tried to phone Robilotto, but could not get through to him.

In early October, Robilotto telephoned K-C saying he was now ready to talk. The Kowalchyks, accompanied by Jones, appeared at union headquarters at the appointed time; the union business agent Smith informed them after some wait that Robilotto was out of the city, as the Trial Examiner found he was. Smith suggested that the Kowalchyks telephone for another appointment; Jones countered that it was up to Robilotto to call him. Instead, Robilotto called K-C about October 24 to inquire whether K-C was paying a retroactive wage increase provided in the new area contract; on receiving a negative answer he said that he would take the matter up with the grievance board and that the company would "hear from this." After the lapse of a month, one Bonomo, whom the Board was justified in finding to have acted as agent of the union, informed the Kowalchyks that he had overheard Robilotto saying the union was about to take "drastic action" against K-C. He asked if he could "help." The Kowalchyks answered that they wanted to negotiate a contract with Local 294 but only through Jones.

On December 2, Bonomo told the Kowalchyks he had been sent by Robilotto to arrange a meeting between them and the union without Jones' attendance. Robilotto, he said, "just don't care to have Mr. Jones present." Two days later one of the Kowalchyks found Bonomo and Smith awaiting him on the platform of a warehouse. Smith referred to an "upsetting trend" between K-C and the union, and inquired why K-C did not want to meet with the union. On being told that K-C wanted a meeting but only with Jones present, Smith replied that the union did not want any lawyers present and there was no reason why a satisfactory agreement could not be reached without them. On December 8, Bonomo again came to the K-C office; he was told that the Kowalchyks would meet with the union if Mr. Jones was there, and rejoined that Robilotto would not meet with Jones. The next day Bonomo and two other men who said they were from the union informed K-C that if it did not immediately live up to the terms of the new area contract, "economic action would begin the following day." It did.

The Board's Trial Examiner recommended that the complaint be dismissed, on two grounds. The first was that there was no proof that Local 294 was the employees' exclusive bargaining agent in connection with a new contract, that Local 294 thus had no statutory duty to meet with K-C, and that in consequence the union was free to determine on what basis it would. The second was that the conduct of the union did not amount to restraint or coercion in any event. The Board overruled the Examiner and issued an order requiring the respondents to "Cease and desist from attempting to dictate to, or in any other manner restraining or coercing, K-C Refrigeration Transport Company, Inc., in the selection of its representatives for the purposes of collective bargaining or in the adjustment of grievances." It here seeks enforcement of this order. The respondents filed an answer but did not submit a brief or present oral argument.

Section 8(b) (1) (B) of the National Labor Relations Act, making it an unfair labor practice for a labor organization "to restrain or coerce" an employer in the selection of his representatives for collective bargaining or the adjustment of grievances, is in some ways a counterpart of § 8(a) (1), which makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" in § 7, one of which is "to bargain collectively through representatives of their own choosing." A textual difference is immediately apparent, namely, that § 8(b) (1) does not include "interfere with." The legislative history indicates that the difference, so far as it relates to the problem dealt with in § 8 (b) (1) (B), resulted from accident more than from design. The Senate bill, as presented by Senator Taft, S. 1126, 80th Cong. 1st Sess., contained a provision, § 8(b) (1), making it an unfair practice for a labor organization to "interfere with, restrain, or coerce" an employer in the choice of his bargaining representatives; it had no provision, such as that now in § 8(b) (1) (A), making it an unfair practice for a labor organization to interfere with the § 7 rights of employees. In contrast, the House bill, H.R. 3020, 80th Cong. 1st Sess., contained two provisions, § 8(b) (1) and § 8(c) (1), relating to interference by unions and employees with § 7 rights. In his statement opposing the bill, Senator Wagner expressed fear lest "interfere" might be read to include ordinary solicitation by a union organizer, 93 Cong.Rec. 3323 (1947). When the Senate passed the House bill, the cited provisions of the two bills were consolidated into what is now § 8(b) (1), and "interfere" disappeared. Evidently the change stemmed from considerations relating to the subject-matter of clause (A) concerning employees rather than of clause (B) concerning employers. Nevertheless the word was dropped and, even as to employers, the Act cannot be read as if it were still there.

■■ Despite this, the Board's order was entirely warranted. It was immaterial that Local 294 had not been officially designated as exclusive bargaining agent for the new contract. It had been the bargaining agent for the expired contract; K-C wished to deal with it and it wished to deal with K-C for a new contract; nothing at the time afforded the slightest indication that any of K-C's employees wished otherwise; and the breakdown led to a strike. Whether or not the lack of official designation would have been a defense to a charge under § 8(b) (3), it was not to one under § 8(b) (1) (B). We need not determine whether the run-around given Jones in July and August was restraint or coercion, which the Act forbids, or only interference, which it does not. For the events commencing with Bonomo's "drastic action" message of late November and ending with the strike of December 10, afforded ample basis for finding that the union was threatening K-C with a strike unless collective bargaining occurred, at the very time it was refusing to engage in bargaining with Jones as K-C's representative. For a union to refuse to bargain with a proper representative of an employer and yet threaten a strike if bargaining does not succeed is restraint or coercion in both the dictionary and the statutory sense. N. L. R. B. v. International Ladies' Garment Workers Union, 3 Cir., 1960, 274 F.2d 376, refusing to enforce the Board's order in 122 N. L. R. B. 1390 (1959), rests on the ground that because of the employer representative's prior affiliation with the union, the employer had made no good faith offer to bargain; no such circumstance was present here.

Enforcement granted.